1
2
3
4
5
6
7        **UNITED STATES DISTRICT COURT**
8        **NORTHERN DISTRICT OF CALIFORNIA**
9
10
11
12   **MARIO TRUJILLO,**                    **Case No.: 11-CV-0522 YGR**

13              **Petitioner,**

14        **v.**                            **ORDER DENYING PETITION FOR WRIT OF**
                                            **HABEAS CORPUS**
15   **GREG LEWIS, Warden,**

16              **Respondent.**

17

18

19                            **INTRODUCTION**

20        Now before the Court is a habeas corpus petition filed by Petitioner Mario Trujillo pursuant to

21   28 U.S.C. section 2254, advancing six claims based upon trial court error and cumulative effect

22   theory.  (Dkt. No. 1.)  Respondent Greg Lewis has filed an answer and a memorandum of points

23   and authorities in support thereof, as well as exhibits (Dkt. Nos. 5, 6-37); Petitioner has filed a

24   traverse (Dkt. No. 62).

25        For the reasons set forth below, the petition for such relief is **DENIED**.

26                            **BACKGROUND**

27        Petitioner was originally charged by amended information with first degree murder (§ 187,

28   subd. (a); count 1), shooting at an occupied motor vehicle (§ 246; count 2), obliterating the

United States District Court
Northern District of California

identification of a firearm (§ 12090; count 3), and actively participating in a criminal street gang (§ 186.22, subd. (a); count 4).  The information further alleged that the offenses in counts 1 through 3 were committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that Petitioner personally discharged a firearm during the commission of the offense in count 1 (§ 12022.53).

The trial court heard motions in limine on February 15, 2006, and testimony began on February 22, 2006.  Prior to submission of the matter to the jury on March 6, 2006, the prosecutor withdrew count 4.  On March 14, 2006, the jury informed the court that it found Petitioner guilty of the offense in count 3, and it found the gang enhancement as to that offense to be true, but it could not reach a verdict as to the offenses in counts 1 and 2.  The trial court accepted the verdict as to count 3 and declared a mistrial as to counts 1 and 2.  On May 25, 2006, the trial court sentenced Petitioner to seven years in state prison on count 3.

Petitioner appealed directly, contending in part that there was insufficient evidence to support the conviction on count 3.  The California Court of Appeal agreed and reversed the judgment. *People v. Trujillo* (Jan. 17, 2008, H030321) (unpublished).

In the meantime, the trial court heard motions in limine for the retrial beginning on June 5, 2007.  The trial court denied Petitioner's motion to exclude evidence of a nine-millimeter handgun seized from his bedroom on the night of his arrest, and transcripts of jail telephone calls between Petitioner and his father and Petitioner and his brother.  The trial court also denied Petitioner's motions to present expert testimony on eyewitness identifications and to present evidence of third-party culpability.  After conducting an *in camera* hearing on June 11, 2007, the trial court denied Petitioner's request to disclose the identity of a confidential informant.

Although Petitioner's counsel waived formal reading of the information to the jury venire, he did not object when the trial court informed the venire that Petitioner was being tried on three counts: "The first one is homicide; Count 1.  The second one is shooting at a vehicle; that's count 2.  And the third one is knowingly participating in a street gang with knowledge that the gang engaged in a pattern of criminal activity."

United States District Court
Northern District of California

2

United States District Court
Northern District of California

The Court adopts as its account of the facts the relevant summary set forth in the last reasoned opinion of the California Court of Appeal decision on direct review of Petitioner's conviction. *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009). For purposes of this summary, the Court notes in advance that the color blue is associated with the Sureño street gang and the color red with the Norteño street gang. Those facts are as follows:

> On the night of August 27, 2004, Juan Raya helped his friends Jorge, Edgar, Jose, and Hugo take a brake light off of a car Jorge had parked at his house on Pacific Avenue in order to put the light on Edgar's car. While they worked, Hugo's girlfriend Maria sat in the driver's seat of her car which was parked on the street behind Edgar's car. Hugo was wearing a blue plaid shirt, Jose was wearing a white T-shirt with small blue stripes, and Raya was wearing a blue T-shirt under a gray hooded sweatshirt.

> As the men were removing the light from Jorge's car, a new Honda Accord with its windows halfway down passed by them very slowly. Somebody mentioned that the people in the car were staring at them. Hugo and Jose saw at least three people in the car, but neither of them recognized anybody. Edgar and Jorge thought that the car and the people were the same ones they had seen at the apartment complex they had passed on Pacific Avenue as they drove from Edgar's house to Jorge's house that night.

> The Honda turned the corner at Del Monte. Hugo got back into the passenger seat of Maria's car while Jorge and Edgar put the light on Edgar's car. Raya and Jose stood nearby. A man wearing a white hooded sweatshirt and dark pants walked up to Edgar's car from the corner of Del Monte and Pacific. As he passed by Jose and Raya, the man asked twice in English, " 'Are you guys gangsters?' " Jose responded, "We are just racers, bro." Edgar and Jorge also said that they were "just racers," and that they did not want any problems. Edgar recognized the man as somebody who had gone to his high school. Both Hugo and Maria watched what was happening and got a good look at the man's face. Raya approached the man but did not say anything. The man pulled out a revolver and pointed it at the back of Raya's head. Jorge yelled at the man to put the gun away. The man pulled the trigger, and the gun "clicked," but it did not fire. Jorge yelled at Raya to run, and Jorge ran towards Del Monte, but Raya did not move. The man pulled the trigger again, and this time the gun fired. Raya fell to the ground face down. The man turned and looked at Maria, pointed his gun at her, then turned and pointed the gun at Hugo and fired it. Hugo, Jose, Edgar, Jorge, and Maria all identified defendant at trial as the man who shot Raya and who also fired at Hugo while Hugo was in Maria's car.

> Defendant turned back and looked down at Raya and at Jose. He then walked quickly down Pacific toward the apartment complex and in the opposite

3

direction from Del Monte. Jose turned Raya over and told him that everything would be okay. He then ran after defendant. Edgar followed, but then yelled at Jose to stop because defendant still had the gun. Jose and Edgar returned to Raya. Edgar called 911 and Jose flagged down a passing police car.

Hugo ducked down when defendant fired at him and he told Maria to get them out of there. Maria backed the car up then sped up to Del Monte, turned right, and drove up to the next block, where she picked up Jorge. They all drove to Maria's mother's house and Maria's mother took them back to Jorge's. The police were at Jorge's when they returned. They told the officers that they had seen what happened. Officers separately took Hugo, Maria, Jorge, Jose and Edgar to the police station, where they separately described to officers what they had seen and heard. However, it was clear that some of the witnesses had talked to each other prior to the interviews, because they shared information during the interviews that they had learned from others.

Salinas Police Officer Arlene Currier was driving westbound on Del Monte near Pacific on the night of August 27, 2004, when two men flagged her down and told her that somebody had been shot. After she located Raya, who was still breathing, the officer secured the area and called for backup. She also broadcast the reported description of the shooter: an "Hispanic male adult, about 5′7″, approximately, wearing a white hooded sweat shirt, and gray pants," who was last seen heading southbound on Pacific on foot. A few minutes later another officer broadcast a reported description of the shooter as an Hispanic male adult, " '21 or 22; 5′7″; 160; white hooded sweater with gray pants,' " carrying a " 'silver handgun with brown pistol whip.' " Jose reported to an officer that the suspect was between the ages of 20 and 22 years old, approximately five feet eight inches tall, weighing 170 pounds, having a medium complexion and a light mustache, and wearing a white sweater, but the officer did not broadcast that description because a similar description had already been broadcast.

Salinas Fire Department paramedics were dispatched to the area of Pacific and Del Monte at 12:03 a.m. on August 28, 2004. Officers directed the paramedics to Raya, who was lying on the sidewalk about 30 to 50 feet down Pacific Avenue. The paramedics pronounced Raya dead at 12:14 a.m. The cause of Raya's death was later determined to be a gunshot to the top of the back of his head. Although Raya had a tattoo that could be considered gang related, it would have been covered by his clothing and not visible to the shooter at the time of his death. The parties stipulated that a chemical analysis of the blood samples taken from Raya during the autopsy indicated that Raya "took cocaine within several hours of his death" and that "the dose that [he] took was a recreational dose taken with alcohol."

Officers recovered bullet fragments but no casings at the scene. A bullet apparently hit the rack on a van and lodged in a residence. Other bullet fragments were recovered from Raya's skull during the autopsy. An officer determined that

4

the bullets were probably hollow point and that they were fired from either a .38 special or a .357 magnum revolver. The fragments were not large enough to enter information on them into the Integrated Ballistics Identification System (I.B.I.S.). Officers saw a white hooded sweatshirt in the back of a pickup truck parked on Pacific away from the murder scene in the direction defendant fled after the shootings, but the sweatshirt was neither seized nor photographed.

The day after the shooting, Hugo, Jorge, Edgar and Jose got together at Edgar's house and talked about what had happened. Edgar told them that he recognized the shooter from his high school. Edgar went to that high school between 2001 and 2004. Defendant's pictures are in the 2000, 2001, and 2002 high school yearbooks, which can be found at the Salinas public library. Edgar later told the police that he found a high school yearbook, but that he did not find a picture of the shooter.

The parties stipulated that "on October 3rd, 2004, at 8:05 a.m., the defendant Mario Trujillo was treated at Natividad Medical Center for gunshot wounds, and was weighed by medical staff at that time; his weight at that time was 102.5 kilograms, which is equivalent of 225 and a half pounds, one kilogram for every 2.20 pounds."

In late December 2004 and early January 2005, officers separately showed Maria, Hugo, Edgar, Jose, and Jorge the same photographic lineup. Each of them identified defendant's picture.

Officers arrested defendant on January 8, 2005, and searched his home pursuant to a search warrant. At the time, defendant was 5′9″ tall, and weighed 220 pounds, but he weighed 180 pounds on June 12, 2004. The officers found a loaded semi-automatic nine-millimeter pistol, a separate loaded nine-millimeter magazine, and a number of live hollow-point cartridges in a speaker box in defendant's bedroom. An officer later test-fired the pistol and determined that it did not match any cartridges that are in I.B.I.S. The officers also found red sweatshirts, red and white shirts, and a maroon San Francisco 49ers beanie cap in defendant's bedroom, and two 49ers sweatshirts in defendant's sister's bedroom. Defendant's sister told the officers that the one hooded sweatshirt in her room belonged to defendant. She also told the officers that, beginning the previous year, she suspected that defendant's friends were Norteño gang members, but that defendant never told her he was a gang member. Defendant referred to Sureño gang members as scraps and he wore red or burgundy beanies on his head. In a jailhouse telephone conversation with his father, defendant said that he got the gun found in his bedroom for protection after he was shot at.

Becky Diaz was with defendant when he was arrested on January 8, 2005. She testified that prior to the summer of 2004, she saw defendant at parties at the apartment complex on Pacific Avenue where she went "to hang out with" her friends. When she started dating defendant in June 2004, she stopped going to

5

those parties. She does not remember whether or not she was with defendant on the night of August 28, 2004.

Salinas Police Officer Bryan McKinley testified that Norteño street gangs formed shortly after the Nuestra Familia prison gang. The gangs are very structured in prison, but are much more informal "[o]n the street." There are approximately 600 Norteño gang members in Salinas, and the various gangs claim specific neighborhoods. Norteño gang members associate with the color red. The Mexican Mafia and Sureño gang members are their rivals. Sureño gang members associate with the color blue. Norteños refer to Sureños as "scraps."

East Las Casitas (E.L.C.) is a Salinas Norteño street gang. The primary activities of Salinas Norteño street gangs are the continuing commission of crimes such as murder, attempted murder, robbery, burglary, intimidation of witnesses and victims, carjacking, and kidnapping. On March 8, 2004, Adam Delgado, a Norteño gang member who had been yelling Norteño gang slogans, shot a young man in Salinas he thought was a Sureño gang member. As a result, Delgado was convicted of attempted murder with the use of a gun and with a gang enhancement. On January 15, 2004, two juveniles who were Norteño gang members, Orlando G. and Steven L., attacked an individual on the street while yelling "Las Casitas ." During the confrontation, another person came to the victim's help and was shot in the back of the head. That person died as a result of the gunshot. The juveniles were found to have committed assault with a deadly weapon with a gang enhancement, and were committed to the California Youth Authority. On September 2, 2002, Norteño gang member Mauro Lopez was with two other Norteño gang members when he fired a gunshot into an individual's vehicle. Lopez was subsequently convicted of assault with a firearm with a gang enhancement.

In Officer McKinley's opinion, defendant is an active Norteño gang member. In March 2002, defendant was present during a shootout between Norteño and Sureño gang members in Salinas. Norteño gang signs and letters from known Norteño gang members were found in his bedroom. He has been housed in the county jail with other active Norteño gang members, and has had Norteño gang member cellmates and visitors. Other known Norteño gang members have provided money for defendant's jail account. In addition, defendant was identified as a member of E.L.C. on a "kite" roster of gang members seized at the county jail. His former jail cellmate identified him in a taped jail telephone conversation as a member of E.L.C. in 2006. On April 23, 2007, defendant and another Norteño gang member were involved in an incident where a Norteño gang dropout was attacked at the jail.

Also, in Officer McKinley's opinion, if a Norteño gang member were to be involved in a shooting incident like the one at issue here, the crime would be committed for the benefit of a Norteño criminal street gang. The crime is a very violent crime and is the type of crime that members of the community fear will

6

happen in their community. It also causes fear of retaliation as well as respect for the gang and the individual involved.

On June 22, 2001, Jorge was the victim of a battery by two unknown Norteño gang members who had challenged him to a fight when he was wearing a blue belt. On March 17, 2004, Jorge was the victim of a battery on school grounds by several Norteño gang members after they asked him if he was "a scrap." On June 12, 2004, when defendant was arrested on unrelated charges, he told jail personnel that he had no enemies in the jail and that he would be comfortable housed in the general population. Defendant told the jail personnel the same thing when he was arrested on January 9, 2005. On September 28, 2005, when Edgar was arrested on unrelated charges, he was wearing a blue shirt and he informed jail personnel that he was associated with a gang, that he had Norteño enemies housed in the jail, and that he wanted to be housed in administrative segregation

## STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court

United States District Court
Northern District of California

making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Habeas relief is warranted only if the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see, e.g., DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) (exclusion of husband's journal and Petitioner's state of mind testimony was an unreasonable application of federal law and had a substantial and injurious effect on verdict.)

### DISCUSSION

As grounds for federal habeas relief, Petitioner advances six claims:  (1) that the trial court's exclusion of a defense expert who would have testified about the unreliability of witnesses' identifications was in error; (2) that the trial court's admission of a 2004 booking report violated his Sixth Amendment right to confrontation; (3) that the trial court violated Petitioner's Fourteenth Amendment right when it admitted transcripts of Petitioner's telephonic jailhouse conversations; (4) that the trial court erred by denying discovery and excluding evidence of a third-party suspect; (5) that the trial court deprived Petitioner of due process when it denied discovery concerning a confidential informant; and (6) that the cumulative effect of the errors set forth above requires reversal.

The Court considers each claim in turn.

### I.   EXCLUSION OF EXPERT TESTIMONY

In his petition, Petitioner contends that the trial court erred in denying Petitioner's request to present testimony by Dr. Steven Clark concerning eyewitness identification.  (Exh. 1, 1 CT 169.) In denying Plaintiff's request to present expert testimony, the trial court noted that there were five separate identifications, prior photographic lineups to which no identifications were made, no cross-racial identifications and that the gang evidence corroborated the identifications.  The state appellate court affirmed the judgment, reasoning as follows:

> Defendant wanted to call Dr. Steven E. Clark, a psychologist, "to testify about the problems with photo lineups generally, the manner in which identifications are

made, how memory works and how it fades over time, and factors that can affect the validity of an identification via photo lineup including contamination of memory by other sources." The trial court denied the request, finding that the witnesses corroborated each other, that there was no evidence that they talked about identifying defendant as the shooter before they separately picked his photograph out of the lineup, that the eyewitnesses are of the same ethnic background as defendant so there was no problem with cross-racial identification, that the jury instruction on eyewitness identifications "fairly well delineates for the jury the factors that they are to consider in looking or considering eyewitness testimony," and that it is a matter of common knowledge that memory fades over time.

Defendant now contends that the court abused its discretion in denying his request to present expert witness testimony on eyewitness identifications. "When, as here, the only evidence corroborating the witnesses' identification [was] the identification of the other witnesses, exclusion of an identification expert is an abuse of discretion."

"Expert testimony on the psychological factors affecting eyewitness identification is often unnecessary." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995.) " '[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; ... "we do not intend to 'open the gates' to a flood of expert evidence on the subject." [Citation.] We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability ..., it will ordinarily be error to exclude that testimony.' [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1111; see also *People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Sanders* (1995) 11 Cal.4th 475, 509.)

"Exclusion of expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability." (*People v. Jones, supra,* 30 Cal.4th at p. 1112.) In *Jones,* the eyewitness identification of the defendant was corroborated by the testimony of five witnesses. All five witnesses could have been impeached by proof of bias or prior inconsistent statements, and three of the witnesses were accomplices whose testimony required corroboration to support a conviction (§ 1111). The court found that the cumulative corroborative effect of this testimony was sufficient corroboration to give independent reliability to the eyewitness identification. (*Jones, supra,* at p. 1112.)

In this case, we cannot say that the trial court abused its discretion in finding the proffered expert testimony unnecessary because the five eyewitnesses to the shooting substantially corroborated each other's identification of defendant as the shooter, which gave each identification independent reliability. (*People v. Jones,*

*supra,* 30 Cal.4th at p. 1112.) Even if we were to find that the court should have allowed the expert testimony, we cannot say that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the erroneous exclusion. (See *People v. Sanders, supra,* 11 Cal.4th at p. 510; *People v. Watson* (1956) 46 Cal.2d 818, 836.) During the trial, defense counsel was able to cross-examine the eyewitnesses and present other testimony regarding the adequacy or inadequacy of the lighting at the time of the shooting, and regarding suggestions that they got together and discussed identifying defendant as the shooter before they picked his photograph out of the lineup. Counsel argued extensively during closing argument that the eyewitness identifications were unreliable. In addition, the trial court instructed the jury with CALCRIM No. 315, which tells the jury to consider various factors when evaluating identification testimony, including the circumstances affecting the witnesses' ability to observe, the descriptions they gave of the shooter and how the descriptions compared to defendant, and the effects of stress and the passage of time between the event and the identification of defendant. In light of the foregoing and the strong identification and other testimony of the five eyewitnesses, and defendant's lack of an alibi defense, it is not reasonably probable that a different result would have occurred had the expert been permitted to testify. (*Sanders, supra,* at p. 510.) *People v. Trujillo,* H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009).

## A.  Legal Standard

Petitioner argues that the state appellate court's decision is contrary to the Supreme Court's precedents holding that defendants have a constitutional right to present relevant evidence in their own defense.  *Moses v. Payne*, 555 F.3d 742, 756-57 (9th Cir. 2009) (citing *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)).  The Supreme Court has indicated that a defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment and from the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment. *Id.* (citing *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973); *Washington v. Texas,* 388 U.S. 14, 23 (1967).

However, "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules.  *Id.* at 757 (citing *United States v. Scheffer,* 523 U.S. 303, 308 (1998)).  "In fact, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials, and the Supreme Court has indicated its approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'"  *Id.* (*citing Holmes v. South*

1  *Carolina,* 547 U.S. 319, 326 (2006)); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding

2  that due process does not guarantee a defendant the right to present all relevant evidence).[1]

3       "Even if it is proper to admit expert testimony on eyewitness identification under certain

4  circumstances, there is no federal authority recognizing a constitutional right that such testimony

5  must be admitted." *Aguilar v. Cate*, C 11-4267 PJH (PR), 2013 WL 1789382, *7 (N.D. Cal. Apr. 26,

6  2013) (citing *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir. 1986)). "The trial court has

7  broad discretion to conclude that the jury would not benefit from admission of the proffered

8  evidence, and the exclusion of such testimony has repeatedly been upheld in this Circuit." *Id.*; *see*

9  *also Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (habeas relief not available under § 2254(d)

10  for claim that expert testimony to show improper interrogation methods should have been admitted

11  because Supreme Court has not squarely addressed the issue; citing *Moses v. Payne*, 555 F.3d 742,

12  758-59 (9th Cir. 2009)).

13       **B.  Discussion**

14       Petitioner argues that the exclusion of expert testimony violated his right to due process.  The

15  Court is unpersuaded.

16       First, as the Ninth Circuit stated in *Moses*, the Supreme Court has "not squarely address[ed]

17  whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's

18  constitutional right to present relevant evidence."  555 F.3d at 758 (citing *Van Patten,* 128 S. Ct. at

19  746).  Nor do the Supreme Court's cases clearly establish "a controlling legal standard" for

20  evaluating discretionary decisions to exclude expert testimony that a defendant seeks to offer.  *Id.* at

21  758-59 (citing *Panetti,* 127 S. Ct. at 2858).  For this reason, the Court finds that the state appellate

22  court's affirmance of the trial court's exercise of discretion to exclude expert testimony cannot be

23  contrary to or an unreasonable application of clearly established Supreme Court precedent.  *Id.* at 759

24  (citations omitted).

25

26

27  [1]A defendant does have a due process right to present all relevant, mitigating evidence concerning the circumstances of the crime at the penalty phase of a capital trial.  *See Lockett v. Ohio*, 438 U.S. 586,

28  604 (1978); *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir. 1996) (trial court erred by excluding evidence of polygraph test at penalty phase).

Second, as the state appellate court explained, defense counsel was able to develop the theory of eyewitness contamination in front of the jury, presenting "other testimony regarding the adequacy or inadequacy of the lighting at the time of the shooting, and regarding suggestions that they got together and discussed identifying defendant as the shooter before they picked his photograph out of the lineup." *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009). For example, during cross-examination of the eyewitnesses, defense counsel amply addressed inconsistencies and gaps in their testimony, calling attention to the discrepancies in how they identified a vehicle that had driven by shortly before the shooting. (Exh. 4, 2 Trial Tr. 357:17-19.) Counsel also pointed to the length of time between the incident and the photographic lineup, the fact that the eyewitnesses spoke to each other the day of the lineup, and the quality of the lighting the night of the incident. (Exh. 4, 2 Trial Tr. 417-20.) Counsel repeatedly stressed that the witnesses thought they recognized the Petitioner from high school and had discussed this when they conferred after the incident. Through the above testimony, the defense was able to suggest, as the expert witness would have testified, that "memory suffers from suggestibility and is influenced by cues and expectations." (Dkt. No. 62 at 6:10-12).

Moreover, Petitioner's claim that he was deprived of an opportunity to challenge the prosecution's theory of identity lacks merit. The court of appeal considered this argument and found that the defense had been permitted to attack adequately the prosecution's case. *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009). In closing argument, defense counsel stressed that identity was central to the case and witness contamination was a key concern. (Exh. 4, 6 Trail Tr. 1563:19-20.) Counsel emphasized repeatedly the hazards of such testimony, reciting data from the Innocence Project which found "75 percent of the 200 cases that have been reversed because of DNA were based on eyewitness identification." (Exh. 4, 6 Trial Tr. 1567:6-8.)

However, as the court of appeal noted, five eyewitnesses substantially corroborated the identification of Petitioner as the shooter, and the Petitioner lacked an alibi defense. *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009). Thus, there was significant record evidence disproving Petitioner's theory of innocence. Petitioner theorizes that the witnesses' memory may have been contaminated by external factors, (Exh. 4, 10 Trial Tr. 2467:12-22), but

"there was no evidence that [the witnesses] talked about identifying defendant as the shooter before they separately picked his photograph out of the lineup." *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009).

Petitioner argues that excluding the expert testimony was unreasonable because cross-examination is "not a substitute for the defense evidence that was excluded." (Dkt. No. 62 at 5:25-26). Petitioner also claims that exclusion of the defense expert witness was "arbitrary" (Dkt. No. 62 at 8:1) and an unreasonable application of controlling law since "the only reasonable conclusion" would have been to allow the expert testimony. (Dkt. No. 62 at 9:19.) Petitioner's claims fails. First, the state appellate court reasonably concluded that "the proffered expert testimony was unnecessary because the five witnesses to the shooting substantially corroborated each other's identification of the defendant as the shooter, which gave each identification independent reliability." *People v. Trujillo*, H032260, 2009 WL 3340496 (Cal. Ct. App. Oct. 19, 2009). Given the trial record, the state appellate court could have also reasonably concluded that the proffered testimony entered the trial through other channels. Second, the Supreme Court has held that "the Constitution permits judges to exclude evidence that is repetitive . . . , [or] only marginally relevant." *Holmes v. South Carolina,* 547 U.S. 319, 326 (2006) (internal quotations omitted). Given these circumstances, it cannot be said that in excluding the expert testimony the court abused its discretion and violated Petitioner's right to present a complete defense.

Moreover, even if the expert testimony had been presented to the jury, it is not reasonably probable that a result more favorable to the defendant would have been reached. Federal habeas relief is warranted only if the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Plaintiff cannot show that this standard has been met.

The jury heard extensive argument from defense counsel about the reliability of the eyewitness testimony. The jury was exposed to the testimony of the five witnesses, and Defendant was permitted to present evidence of their fleeting opportunity to observe the shooter, the stress and urgency of the event, the nature of the surroundings and the lighting, questions relating to bias, their conflicting descriptions of the shooter both initially and later on, and their group discussions relating

United States District Court
Northern District of California

to the shooter and the shooting.  In addition, the court instructed the jury to evaluate the eyewitness testimony's truth and accuracy by considering various factors that bore substantial similarity to the testimony the expert witness sought to offer.  (Exh. 4, 22 Trial Tr. 5268: 2-21.)  Furthermore, during closing arguments, defense counsel reiterated the court's instructions to the jury, emphasizing each consideration and relating them to the facts of the case.  (Exh. 4, 6 Trial Tr.1563-65.)  In sum, the jury was sufficiently exposed to the defense's theory of witness contamination and the reliability of eyewitness testimony.  In light of such facts, the court of appeal reasonably concluded that had the expert been permitted to testify, it is not reasonably probable that the jury would have arrived at a different conclusion.

For these reasons, the Court concludes that Petitioner has not shown that the state appellate court's affirmance of the trial court's exclusion of expert testimony constituted an unreasonable application of, or was contrary to, existing Supreme Court authority.  *See* 28 U.S.C. §2254(d). Accordingly, Petitioner's first claim is **DENIED**.

**II.**     **ADMISSION OF 2004 BOOKING REPORT**

Petitioner contends that he was deprived of his constitutional rights to confrontation under the Sixth Amendment and/or due process under the Fourteenth Amendment when the trial court admitted into evidence a 2004 booking report without presenting for cross-examination the witness who supplied the information to the form.  (Dkt. No. 1 at 7.)  The Court of Appeal considered Petitioner's arguments and disposed of them as follows:

> Salinas Police Officer Kenneth Ellsworth testified on cross-examination at trial that on January 8, 2005, he received a "Be on the Lookout" report for defendant which described defendant as five feet nine inches tall and 220 pounds. Ellsworth testified that the description came from defendant's last police contact as recorded in "an in-house records system where we keep track of arrests and contacts with various people, whether it be from traffic accidents or homicide arrests." Sergeant Sheldon Bryan testified on cross-examination that he listed defendant's height and weight as five feet nine inches tall and 220 pounds on the pre-booking sheet he completed for defendant the night of January 8, 2005, following defendant's arrest, and that it "appear[ed] to be accurate." As stated above, the court granted the prosecutor's request to admit defendant's January 8, 2005 booking form into evidence when defendant did not object to its admission.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On redirect examination, the prosecutor asked Sergeant Bryan what defendant's height was on June 12, 2004. Defendant objected on hearsay grounds. The court sustained the objection while also noting a lack of foundation. Sergeant Bryan then testified that law enforcement agencies in Monterey County have booking stations with computer terminals and cameras where information such as an arrestee's height and weight are entered and correlated with the booking photographs. Sergeant Bryan identified a Monterey County pre-booking form for defendant dated June 12, 2004, stating it was identical to the form he filled out on January 8, 2005, "that's used in the regular course of business for the Salinas Police Department in booking inmates into the jail." Sergeant Bryan testified that the June 12, 2004 form would have been completed when defendant was booked into the county jail. "[T]hese forms are what the jail staff fill out. The jail staff are what provides us with these forms so that we can get it all done before we get them to the jail. So once the person has been arrested, we transport them to the police department, process them, get their photographs and then complete this form, and then we transport to the jail and turn this form [in to] the jail to them." Sergeant Bryan then testified that the June 12, 2004 form listed defendant's height and weight as five feet nine inches tall and 180 pounds. Defendant objected on the grounds of lack of foundation and lack of personal knowledge as to how the form was filled out, but the court overruled the objection.

Defendant now contends that his height and weight as listed in the June 12, 2004 form was inadmissible hearsay, and that "the prosecution failed to establish a proper foundation with someone with personal knowledge of how the document was prepared." "While [Sergeant] Bryan testified that the booking information was prepared by a public employee in the course of public employment, he did not testify it was prepared at the time of the booking; thus the requirement of [Evidence Code section 1280,] subdivision (b) was not met. [Officer] Ellsworth said the information was derived from other sources, perhaps previous booking forms, driver's licenses, and the like. This being the case, there was insufficient evidence of the information being 'made at or near the time of the act, condition, or event.'"

Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." "A trial court has broad discretion in determining whether a party has established these foundational requirements. [Citation.] Its ruling on admissibility 'implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary. (Evid.Code, § 402, subd. (c).)' [Citation.] A reviewing court may overturn the trial court's exercise of discretion '

15

"only upon a clear showing of abuse."' [Citations.]" (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)

In this case, we find that the trial court did not abuse its discretion in admitting testimony on the contents of defendant's June 12, 2004 pre-booking form. The court could have found that Sergeant Bryan's testimony satisfied the foundational requirements of Evidence Code section 1280 as to the form. Sergeant Bryan's testimony established that the form was completed by the county jail staff as part of their duties at the time defendant was booked into county jail, and that defendant was present and his photograph was taken at the time the form was completed. Thus, the method and time of the preparation of the form, along with its sources of information, were such as to indicate its trustworthiness. However, even if we were to find that the court abused its discretion in admitting the testimony on the contents of the June 12, 2004 form, we would not find the error prejudicial. Defendant did not object to admission of the information on his January 8, 2005 form; his height was listed as five feet nine inches on both the June 12, 2004, and the January 8, 2005 forms; and the information on neither form could be used to conclusively establish defendant's weight on the night of the shooting incident, which was more than two months after the date of the first form and more than four months before the date of the second. Defendant has not established prejudicial evidentiary error. *People v. Trujillo*, 2009 WL 3340496, *13 (Cal. Ct. App. Oct. 19, 2009).

**A. Legal Standard**

The Supreme Court has held that testimonial hearsay evidence is not permitted unless the declarant is unavailable and the defendant had a prior opportunity to examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation and citation omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Crawford*, 541 U.S. at 50-51. The Court has not specifically indicated whether a booking report is considered to be testimonial. The Court has recognized some exceptions to the hearsay rule, namely, "statements that by their nature [are] not testimonial—for example, business records...." *Id.* at 56. The Supreme Court has held that "[b]usiness and public records are generally admissible absent confrontation . . . because – having been created for the administration of an entity's affairs and not for purpose of establishing or proving some fact at trial – they are not

16

1    testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).  Expert testimony

2    regarding business records prepared by others is not considered testimonial hearsay.  *Flournoy v.*

3    *Small*, 681 F.3d 1000, 1004-05 (9th Cir. 2012) (not unreasonable application of *Crawford* to admit

4    testimony of an expert witness regarding reports prepared by others where the witness' opinion was

5    based on reports which she had peer reviewed and where the reports had been admitted as business

6    records under the California Evidence Code).  Where the Supreme Court has never squarely

7    addressed whether a particular type of statement is testimonial, a state court's admission of such

8    statement at trial as non-testimonial is not "contrary to" clearly established Supreme Court precedent

9    or an "unreasonable application" of *Crawford*, under 28 U.S.C. § 2254(d)(1).  *See Moses v. Payne*,

10   555 F.3d 742, 754-55 (9th Cir. 2009) (finding state court's admission of victim's out-of-court

11   statements to emergency room physician as non-testimonial statements not contrary to clearly

12   established federal law or unreasonable application thereof, because Supreme Court had never

13   "squarely addressed" whether statements made to doctors for purposes of medical treatment and

14   diagnosis were testimonial).

15           A showing of constitutional error under the Sixth Amendment only merits habeas relief if the

16   error was not harmless, that is, if it had a "substantial and injurious effect or influence in determining

17   the jury's verdict."  *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting *Brecht v.*

18   *Abrahamson*, 507 U.S. 619, 638 (1993)).

19       **B.  Discussion**

20           Petitioner contends that the 2004 booking report was testimonial evidence and that he had a

21   constitutional right to cross-examine its preparer.  The Court disagrees.  As explained above, the

22   Confrontation Clause requires that a defendant be permitted an opportunity for cross-examination

23   where evidence is of a testimonial nature.  *Crawford,* 541 U.S. at 59.  Here, the booking report of

24   which Petitioner complains was not testimonial evidence.  This form was created by police

25   department staff as part of their duties at the time defendant was booked at a jail in furtherance of

26   routine administrative purposes.  (*See* 3 Trial Tr. 640-43.)  Police department staff complete booking

27   reports every time an inmate is booked; these reports occur in the regular course of booking inmates

28   at the county jail.  (*Id.* at 643.)  The booking reports are then used as a part of an "in-house records

United States District Court
Northern District of California

17

system where [the police department] keep[s] track of arrests and contacts with various people..."  (1 Trial Tr. 82: 6-8.)  Such reports are created for the maintenance of the police department's records and for the administration of the police department's affairs.  The appellate court decision to affirm the trial court's admission of the 2004 booking report absent cross-examination of its preparer therefore does not offend the Constitution.

Moreover, this Court agrees with the state appellate court that the admission of this evidence did not have a substantial or injurious effect on the verdict.  In order to require reversal, an error must rise to the level of a "substantial or injurious effect or influence in determining jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  In comparison to other evidence adduced at trial, the 2004 booking report played, if anything, a minor role in the jury's decision.  Indeed, neither the June 12, 2004 booking report, generated more than two months prior to the shooting, nor the January 8, 2005 booking report, generated over four months after the shooting, could be used conclusively to determine the weight of Petitioner at the time that the crime was committed.  Such evidence does not rise to the weight of other evidence supporting the state's theory: Petitioner was identified by five eye-witnesses, was found with bullets like those used in the murder, and was identified as a Norteño gang member.  Thus, the state appellate court reasonably concluded that the admission of the 2004 booking report, even if error, would not require reversal.

In sum, because the 2004 booking report is non-testimonial, it did not trigger Petitioner's confrontation right under the Sixth Amendment.  But even if that were not the case, Petitioner has not established that its admission had a "substantial or injurious effect or influence in determining the jury's verdict."  Nor was the admission of the challenged evidence so prejudicial in the context of the trial as to render Petitioner's conviction unfair.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The state appellate court reasonably so concluded.

Petitioner also asserts that the admission of the 2004 booking report violated his right to due process under the 14th Amendment.  In making this argument Petitioner contends that the reliability of the 2004 booking report could not be established without testimony from the official that completed the form.  (Dkt. No. 1 at 8.)  Thus, this claim is more properly raised under the Sixth Amendment, which specifically confers the right to confrontation and which has been found

United States District Court
Northern District of California

18

1   unavailing.  *See Matta-Ballesteros v. Henman*, 896 F. 2d 255, 261-62 (7th Cir. 1990) (habeas claim

2   based on alleged excessive force during arrest more properly construed as a Fourth Amendment

3   claim than a due process violation; citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Nonetheless, the

4   Court has considered Petitioner's due process argument and finds it unpersuasive.

5        Here, the prosecution offered testimony establishing which officials complete booking

6   reports, the method by which those officials obtain the information recorded in the reports, and the

7   purpose for which those officials complete the reports.  As the court of appeal concluded, that

8   testimony was sufficient to indicate that the 2004 booking report was trustworthy.  The booking

9   report was also relevant, as it provided the jury another tool with which to determine Petitioner's

10  weight at the time of the shooting.  Given that the Supreme Court has not established that the

11  admission of irrelevant evidence violates a defendant's due process rights, Petitioner cannot show

12  that the admission of the 2004 booking report deprived him of the "fundamentally fair trial

13  guaranteed by due process."  *See Holley*, 568 F.3d at 1101; *Pulley*, 465 U.S. at 41.

14       Furthermore, even were this Court to conclude that the state court contravened constitutional

15  authority when it concluded that admission of the 2004 booking report was not error, Petitioner's

16  claim would nonetheless fail.  As discussed above, the 2004 booking report played a relatively minor

17  role in the jury's verdict.  In light of the other evidence against him, Petitioner cannot show that the

18  admission of the 2004 booking report had a "substantial and injurious effect or influence in

19  determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  Accordingly, this claim is DENIED.

20  **III.    TRANSCRIPTS FROM TELEPHONIC CONVERSATIONS**

21       Petitioner contends that the trial court erred in admitting as evidence Petitioner's jailhouse

22  telephone conversations about a 9 mm semi-automatic firearm and ammunition found in Petitioner's

23  bedroom and not used in the crime.  (Dkt. No. 62 at 14).  At trial, the defense moved to exclude the

24  evidence as irrelevant and unduly prejudicial.  The trial court denied the request and Petitioner

25  reasserted his position on appeal.  In denying Petitioner's requested relief, the state appellate court

26  reasoned as follows:

27            Defendant moved to exclude evidence of the gun found in his bedroom
28       and of the jailhouse telephone conversations he had with his father and his
         brother about the gun. The prosecutor contended that the evidence of the gun

United States District Court
Northern District of California

was relevant gang evidence and that defendant's statements, when coupled with the evidence of the gun, were admissible as showing consciousness of guilt. The court denied defendant's motion to exclude the evidence, stating, "[T]he weapon, combined with th[e] conversations between [defendant] and his brother, I think a reasonable inference that the trier of fact can draw from that is that these guns—or that gun will be clean; the inference, I guess, and the argument, then, I think a reasonable inference the trier of fact could draw, depending on the evidence, is that this gun will be clean, another one wouldn't. So the .9 millimeter, the motion to suppress any evidence regarding the presence of the .9 millimeter weapon and that being seized, is denied. The statements—transcripts and statements, the phone calls between [defendant] and his father, the prosecution will be allowed to present that; and also to his brother, will be allowed to present that to the jury as well."

Parts of recordings of the jailhouse telephone conversations were played for the jury, and transcripts with English translations were provided. In the call from defendant to his father on the morning of January 9, 2005, defendant said that he was stopped outside his house because the police had a warrant for his arrest. He saw that the police were at his house and did not want to pull into his driveway, so he pulled into another driveway. He said that he knew that the police found the gun that he got for protection after he had been shot at. His father asked him if he had bought the gun but defendant refused to say. His father asked if he had shot anybody. Defendant replied, "no, nobody, no." "It's ... is ... not with those. It's going to come out clean but it says here that they gave me another charge of, a murder charge and ... [¶] ... [¶] And four attempted homicides and um street terrorism. And I told him that he's wrong...."

In the January 26, 2005 telephone conversation, defendant's brother asked him if the gun they found was "clean." Defendant responded, "From what I know, yeah." Defendant's brother said that if it is clean, defendant could be charged with having the gun "but they can't get you for that dude." Defendant responded, "They charged me, they charged me for a gun, three months that I'll be in here, that's already first on my first (inaudible)." Defendant said that a detective had told him that the evidence showed that he was at a party, some people passed by, and that he went over to where the people were and shot at them.

Defendant also moved pursuant to Evidence Code section 352 to exclude evidence of a jailhouse telephone call that defendant made to Becky Diaz on January 31, 2005, where Diaz arranged a three-way call with Joel M., an alleged active Norteño gang member, so that defendant could talk to Joel. The prosecutor argued that the conversation showed that defendant was associating with Norteño gang members while he was in jail. The court ruled that the recording of the call could not be played for the jury, but that Officer McKinley, the gang expert, could review the transcript of the call and testify generally about it and its significance "without getting into any of the specifics."

McKinley testified at trial that defendant called Diaz and had her place a three-way call to Joel, and that defendant then told Joel that they found a gun when they searched his home after his arrest. McKinley testified that the transcript of the call indicates that defendant said, " 'I know they found the gun and they also found me.' "

Defendant acknowledges that the court instructed the jury on adoptive admissions (CALCRIM No. 357), and evidence of defendant's statements (CALCRIM No. 358). Defendant contends, however, that the evidence of the gun found in his bedroom and the jailhouse telephone conversations was irrelevant and unduly prejudicial. As the seized gun was not used in the charged offenses, "[w]hat little probative value it might have had was well outweighed by its dramatic effect. The evidence did not become admissible because of the jailhouse calls. Admission of the evidence violated due process because it invited the jury to make the legally impermissible inference that he was guilty of the allegations due to his character for possessing weapons and for violence." "While there was great prejudice from admitting the gun, there was little or no probative value in admitting evidence of the jailhouse conversations, and the conversations themselves added to the prejudice."

"Only relevant evidence is admissible [citations], 'and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.]' [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 337.) Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Prejudicial evidence means " 'evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320; see also *People v. Harris* (1998) 60 Cal.App.4th 727, 737.) " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Painting a person faithfully is not, of itself, unfair." (*People v. Harris, supra,* 60 Cal.App.4th at p. 737.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

United States District Court
Northern District of California

"Simply stated, and as a general rule, if a party to a proceeding has made an out-of-court statement that is relevant and not excludable under Evidence Code section 352, the statement is admissible against that party declarant." (*People v. Castille* (2005) 129 Cal.App.4th 863, 875–876, fn. omitted (*Castille*); Evid. Code, § 1220.) "Evidence Code section 1220 covers all *statements* of a party, whether or not they might be characterized as admissions. [Citations.]' [Citation.]" (*Castille, supra,* at p. 876.)

Evidence Code section 1221 "generally permits hearsay to be admitted against a party, when that party has adopted it or agreed that a statement, originally made by someone else is true. The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence, equivocal or evasive conduct." (*Castille, supra,* 129 Cal.App.4th at p. 876, fns. omitted.) " 'There are only two requirements for the introduction of adoptive admissions: "(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief* in, the truth of such hearsay statement." [Citation.]' [Citation.]" (*Ibid.;* see also *People v. Davis* (2005) 36 Cal.4th 510, 535.)

In this case, defendant's statements during his jailhouse conversations were admissible as long as they were relevant and not excludable under Evidence Code section 352. The prosecutor argued that the statements were relevant to show consciousness of guilt. Defendant's statements indicate that he knew that he had a gun in his bedroom, but that the gun would not connect him to the charged offenses. His statements could also be reasonably interpreted to indicate a consciousness of guilt of the charged offenses. Defendant told his father that the gun they found would be "clean," from which a jury could infer that the gun that would not be "clean" was not found. Defendant's brother told him that, as long as the seized gun tested "clean," defendant could not be charged with killing Raya, but defendant did not then deny killing Raya. Defendant told Joel that the police found his gun and they found him, from which a jury could infer an admission of guilt. The evidence of the seized gun, which also included evidence that it was not the gun involved in the shooting, placed all of defendant's statements into context. Defendant was not entitled to the exclusion of all this evidence just because it was damaging or placed him in a bad light. Accordingly, we cannot say that the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner when it denied defendant's request to exclude the evidence under Evidence Code section 352. (*People v. Davis, supra*, 36 Cal.4th at pp. 536–538.)

**A. Legal Standard**

A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision. *Boyde v. Brown*, 404 F.3d 1159, 1172, *as amended on reh'g,* 421 F.3d 1154 (9th Cir. 2005). Under AEDPA, a state court's evidentiary ruling is not subject to federal habeas

review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

"Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991).  In such cases, "we must rely on the jury to sort [the inferences] out in light of the court's instructions." *Id.* Admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw" from it.  *Id.*

### B.  Discussion

Petitioner asserts that there was "not a reasonable inference petitioner made adoptive admissions or displayed a consciousness of guilt in his telephone conversations with his family." (Dkt. No. 62 at 15:16-17.)  The Court disagrees.  The evidence of the seized gun, combined with Petitioner's jailhouse conversations, was relevant.  Petitioner's statement to his father revealed that he knew he had a gun in his bedroom, but that the gun would not connect him to the crime.  During a jailhouse phone call, Petitioner's brother stated that Petitioner could not be charged with the crime if the gun found in his bedroom was "clean."  Petitioner did not then deny killing Raya.  At trial an investigator testified that Petitioner told an alleged active Norteño gang member that the police found his gun and they also found him.  (Exh. 4; 3 Trial Tr. at 716-718.)  As the court of appeal concluded, a reasonable inference could be drawn that the evidence that Petitioner had referred to the recovered gun as "clean" could be understood to suggest that Petitioner possessed a different, other gun that was not "clean" or that had been used in the commission of the crime charged.  In addition, the Court

United States District Court
Northern District of California

1  agrees with the court of appeal that based on such evidence, the jury could infer that the weapon used

2  in the shooting would not be found.  Such inferences are probative on the question of guilt; thus,

3  Petitioner cannot show that there "are *no* permissible inferences the jury may draw from the

4  evidence" such that due process is violated.  *Jammal*, 926 F.2d 918, 920 (9th Cir. 1991).

5       In sum, the evidence with which Petitioner takes issue was reasonably found to support a

6  number of permissible inferences.  Petitioner has not met the "heavy burden" required to show that

7  the trial court's evidentiary ruling constituted an unreasonable application of existing Supreme Court

8  authority.  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

9  **IV.  EXCLUSION OF EVIDENCE CONCERNING THIRD-PARTY SUSPECT AND THE IDENTITY OF**

10  **CONFIDENTIAL INFORMANT**

11       Petitioner contends that by denying his discovery request for San Rafael Police records

12  pertaining to a fellow gang member and evidence relating to the identity of a confidential informant,

13  the trial court precluded him from presenting a defense and deprived him of due process.  In denying

14  the Petitioner's discovery request relating to the third party, the trial court noted that there was not

15  sufficient similarity between the offenses committed in San Rafael and the homicide for which

16  Petitioner was charged.  In addition, the trial court noted that there was no direct evidence linking the

17  third party, Ruben Lopez, to the shooting, nor were the confidential informant or Ruben Lopez

18  percipient witnesses to the Salinas shooting.  The court of appeal affirmed the trial court and

19  reasoned as follows:

20       As part of his motions in limine, defendant sought discovery of San Rafael
21       Police Department reports regarding a specific January 2005 Marin County
         criminal case that defendant described, contending the evidence "is relevant
22       and admissible both as impeachment of the prosecution witness Ruben Lopez,
         admissible evidence of bad character on the part of Ruben Lopez and as third
23       party culpability evidence." Defendant contended that, according to
         information previously disclosed by the prosecution in this case, Lopez, an
24       E.L.C. gang member, robbed a victim in San Rafael while armed with a
         chrome revolver, which he thereafter gave a friend in Salinas for safe keeping;
25       Lopez admitted to a confidential informant (C.I.) that he was present at the
         shooting at issue here; Lopez matched the description the eyewitnesses gave
26       of the shooter; and Lopez has blamed the shooting on defendant, his "fellow
27       Norteño gang member."

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

At the hearing on the motion, the prosecutor stated that she did not intend to call Lopez as a witness, unless she needed him to be a rebuttal witness. The prosecutor further stated that, contrary to defendant's claim, "at no time does the C.I. indicate that Ruben Lopez ever said that he was present at the time of the shooting. He indicates that the first thing that happened was hearing about the shooting on the night that it occurred and it was very close to where Mr. Lopez had been, and that he just said that it had happened, and that it was a southerner who had gotten killed. And then it was later on that Ruben Lopez contacted the C.I. and said that it was Mario, 'The Homie, Mario,' who told him he had done the shooting. And he even gave specific words as to what it was that he said. And he went through this several times, and the C.I. was very consistent."

The court ruled that the Marin County case involved gang activity "motivated by robbery. So I don't think there's a sufficient similarity between the offenses in San Rafael and this offense, nor is there any direct evidence linking Ruben Lopez to this homicide. So, for the reasons that I've stated, the request to have [Lopez] identified as a third-party culpable person is denied." The court later held an in camera hearing to determine whether it should disclose the identity of the confidential informant. The court summarized its findings after that hearing for defendant as follows: "Number one, the confidential informant was not a percipient witness to the shooting on Pacific Street without any question; number two, ... based on what the confidential informant said, ... Ruben Lopez never told the confidential informant that ... Ruben Lopez was present at the time of the shooting. The information of the confidential inform[ant], if not all of the information that that person received[,] was from Ruben Lopez indicating that Mr. Trujillo was the person that had done the shooting."

The court, therefore, denied defendant's request to disclose the identity of the confidential informant and reaffirmed its ruling regarding the third-party culpability evidence. "Clearly, it is of utmost importance for the Courts to protect the identity of persons like this person [who] came forward and provided information. The information ... gave rise to identifying Mr. Trujillo as the shooter, which subsequently gave rise to the assemblage ... of the photographic lineups in question, and in which a number of witnesses identified Mr. Trujillo from those photographic lineups. [¶] In addition to that ... ruling there's nothing that the informant testified to—as a matter of fact, the only information received during the hearing just further confirms my ruling regarding third party culpability as to Ruben Lopez. So I've previously denied that request to have Mr. Lopez testify in that regard, and that ruling remains as previously stated."

Defendant now contends that the denial of his discovery request and the exclusion of the evidence of possible third-party culpability violated his right to present a defense. "The court abused its discretion in excluding the third

25

party culpability defense. Because [defendant] should have been permitted to present the defense, denial of discovery of material which would have led to admissible evidence was an abuse of discretion." Defendant also requests that the court review the transcript of the in camera hearing to determine whether the trial court properly denied defendant's request for disclosure of the identity of the confidential informant.

"A defendant's motion to discover is addressed solely to the sound discretion of the trial court, which has inherent power to order discovery when the interests of justice so demand. [Citations .] Allowing an accused the right to discover is based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information. [Citations.]" (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535; see also *Holman v. Superior Court* (1981) 29 Cal.3d 480, 483.)"The right of discovery in criminal cases is, of course, not absolute. The court retains wide discretion to protect against disclosure of information that might unduly hamper the prosecution or violate some other legitimate governmental interest."(*People v. Superior Court* (*Barrett* ) (2000) 80 Cal.App.4th 1305, 1316; see also Evid.Code, § 1040.) " 'An accused is entitled to any " 'pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense....' [Citation.]" [Citations.]' [Citation.]"(*Barrett, supra,* at p. 1318.)"Pretrial discovery is aimed at facilitating the swift administration of justice, not thwarting it."(*Holman, supra,* 29 Cal.3d at p. 485.)

"[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing ' " 'some evidence' " ' on this score. [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 159–160.)

"[T]hird party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of [the] defendant's guilt,' ..." (*People v. Robinson* (2005) 37 Cal.4th 592, 625.)"[W]e do not require that *any* evidence, however remote, must be admitted to show a third party's possible culpability."(*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*), italics added.) [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt...." (*Ibid.*)"[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable

26

doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325; see also *Hall, supra,* 41 Cal.3d at p. 833.)

Although a trial court's discretionary power to exclude evidence under Evidence Code section 352 "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense" (*People v. Cunningham* (2001) 25 Cal.4th 926, 999), a discretionary ruling under Evidence Code section 352 "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; see also *People v. Lewis* (2001) 26 Cal.4th 334, 372–373; *People v. Robinson, supra,* 37 Cal.4th at p. 625.)

After reviewing the record before us, including the sealed transcript of the in camera hearing, we cannot say that the trial court abused its discretion in denying defendant's request for discovery of police reports underlying the Marin County prosecution of Ruben Lopez, or in denying disclosure of the identity of the confidential informant. Neither Lopez nor the confidential informant testified at defendant's trial, so their credibility is not an issue. There is no evidence that either Lopez or the confidential informant was a percipient witness to the shooting at issue. Lopez told the confidential informant what he knew about the shooting, but neither of them claimed to have been present at the shooting. That Lopez was a member of the same gang that defendant was allegedly involved with, that Lopez robbed a victim with a gun in Marin County, and that he gave the gun to an associate in Salinas, is not evidence that would connect Lopez to the Salinas shooting. Nor could the evidence raise a reasonable doubt as to defendant's guilt. (*Hall, supra,* 41 Cal.3d at p. 833.) In addition, the limited probative value of the evidence was greatly outweighed by the possibility of its confusing the issues or misleading the jury. (Evid.Code, § 352.) Defendant has not shown that the court's denial of his discovery request, denial of his request to present third-party culpability evidence, and/or denial of disclosure of the identity of the confidential informant were an abuse of discretion or denied him his rights to prepare a defense and to a fair trial.  *People v. Trujillo,* H032260, 2009 WL 3340496, *8-10 (Cal. Ct. App. Oct. 19, 2009).

## A.  Exclusion of Third-Party Culpability Evidence

Petitioner contends that because he was precluded from obtaining discovery concerning a third-party suspect or presenting to the jury evidence of third-party culpability, he was unable to present a complete defense.  Petitioner contends that evidence barred by the court would have established that a fellow gang member, Ruben Lopez, committed the murder.  (Dkt. No. 62 at 18.)

27

1   Specifically, Petitioner argues that Ruben Lopez better matched the description of the gunman and

2   was involved in a series of similar violent crimes in San Rafael with a revolver similar to that used in

3   the charged crime.  Petitioner thus contends that the trial court's decision to deny his discovery

4   request for San Rafael Police Department Reports relating to Lopez resulted in Petitioner being

5   unable to present a defense of third-party culpability.  (*Id.*)  Both the trial court and the state appellate

6   court rejected Petitioner's argument.  This Court similarly finds that Petitioner's argument lacks

7   merit.

8                                **1.   Legal Standard**

9        Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the

10  Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees

11  criminal defendants "a meaningful opportunity to present a complete defense" and the right to present

12  relevant evidence in their own defense.  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

13  (quoting *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)).  This right is not unlimited, but rather is

14  subject to reasonable restrictions.  *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *Taylor v.*

15  *Illinois,* 484 U.S. 400, 410 (1988) (An accused does not have an "unfettered right" to present any

16  evidence he or she wishes); *Alcala v. Woodford,* 334 F.3d 862, 877 (9th Cir. 2003).  A state

17  evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense

18  unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."

19  *Scheffer,* 523 U.S. at 308; *see also Crane,* 476 U.S. at 689–91).

20        Evidence of potential third-party culpability must be admitted when, under the "facts and

21  circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.

22  *Chambers v. Mississippi*, 410 U.S. 284, 303 (1973) (exclusion of evidence of third-party confession

23  violated due process where the excluded evidence was highly corroborated and the testimony was

24  crucial to the defense); *Lunbery v. Hornbeak,* 605 F.3d 754, 760–61 (9th Cir. 2010) (exclusion of

25  statement by third party that he had killed defendant's husband deprived defendant of the right to

26  present a defense because the "excluded testimony ... bore substantial guarantees of trustworthiness

27  and was critical to [defendant's] defense").  The Supreme Court has noted that "rules regulating the

28  admission of evidence proffered by criminal defendants to show that someone else committed the

United States District Court
Northern District of California

28

1    crime with which they are charged ... are widely accepted[.]" *Holmes,* 547 U.S. at 327.  Moreover,

2    the Ninth Circuit has determined that where the proffered evidence of third-party culpability simply

3    affords a possible ground of suspicion pointing to a third party and does not directly connect that

4    person with the actual commission of the offense, that evidence may be excluded.  *People of*

5    *Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) (citing *Perry v. Rushen,* 713 F.2d

6    1447, 1449 (9th Cir. 1983)).)  Under California law, a criminal defendant has a right to present

7    evidence of third-party culpability if that evidence is capable of raising a reasonable doubt regarding

8    his own guilt.  *See Spivey v. Rocha,* 194 F.3d 971, 978 (9th Cir. 1999) (citing *People v. Hall,* 41

9    Cal.3d 826, 833 (1986)).  In order for evidence pointing to another suspect to be admissible,

10   however, "there must be direct or circumstantial evidence linking the third person to the actual

11   perpetration of the crime."  *Hall*, 41 Cal.3d at 833.  Motive or opportunity alone is not enough.

12   *Spivey*, 194 F.3d at 978 (citing *Hall*, 41 Cal.3d at 833).

13        Furthermore, a state court's evidentiary ruling is grounds for federal habeas relief only if the

14   ruling renders the state proceedings so fundamentally unfair as to violate due process.  *See Tinsley v.*

15   *Borg*, 895 F.2d 520, 530 (9th Cir. 1990) ("The state court's decision must be so prejudicial as to

16   jeopardize the defendant's due process rights."), *cert. denied,* 498 U.S. 1091 (1991); *see also Reiger*

17   *v. Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986).  "A habeas petitioner bears a heavy burden in

18   showing a due process violation based on an evidentiary decision."  *Boyde v. Brown,* 404 F.3d 1159,

19   1172 (9th Cir. 2005); *see also Jammal,* 926 F.2d at 919-20.  The Court must consider five factors in

20   evaluating whether the exclusion of evidence reaches constitutional proportions: (1) the probative

21   value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of

22   evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative;

23   and (5) whether it constitutes a major part of the attempted defense.  After consideration of these

24   factors, the importance of the evidence must be balanced against the state interest in exclusion.  *See*

25   *Tinsley*, 895 F.2d at 530; *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985), *amended by* 768 F.2d

26   1090 (9th Cir. 1985).

27        Petitioner asserts that the trial court improperly excluded evidence of a potentially

28   exculpatory nature.  The Supreme Court considered this question in *Brady v. Maryland*, holding that

29

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *see also U.S. v. Bagley*, 473 U.S. 667, 675 (1985).  Materiality of evidence is to be "evaluated in the context of the entire record."  *United States v. Agurs*, 427 U.S. 97, 112 (1976).  Excluded evidence is considered to be material where the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995); *see Strickler v. Greene*, 527 U.S. 263, 290 (1999).  "The mere possibility that undisclosed information might have been helpful to the defense or might have affected the outcome of the trial, does not establish materiality under *Brady*."  *United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (internal citations omitted).

The Supreme Court identified "three essential components of a true *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; (3) and prejudice must have ensued."  *Strickler*, 527 U.S. at 281-82.  The burden lies with the petitioner to show that there is a "reasonable probability that his conviction or sentence would have been different had the suppressed documents been disclosed to the defense" such that confidence in the verdict is undermined.  *Kyles*, 514 U.S. at 434-35.  Once constitutional error has been found, it cannot subsequently be found harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  *See Kyles*, 514 U.S. at 436.  In fact, no harmless error analysis under *Brecht* need be performed where the Court has determined that the error was material under the standard set forth in *United States v. Agurs*, 427 U.S. 97, 103-04 (1976).

### 2.  Discussion

Upon review of the record, the Court finds that the denial of the discovery request and the exclusion of Petitioner's requested evidence was not contrary to Supreme Court authority, nor did it result in a deprivation of Petitioner's constitutional rights.  Essentially, the state appellate court and the trial court found that the evidence relating to Ruben Lopez was not material to the case against Petitioner, and that there was no reasonable probability that, had the evidence been disclosed to the

1   defense, the result of the proceeding would have been different.  *United States v. Bagley*, 473 U.S.

2   667, 675-76 (1985).  Moreover, the state appellate court found that such evidence did not rise to a

3   level where it could raise a reasonable doubt as to Petitioner's guilt and therefore upheld the trial

4   court's decision not to permit Petitioner to present evidence of his third-party culpability defense.

5   *See Christian v. Frank*, 595 F.3d 1076, 1083–86 (9th Cir. 2010) (exclusion of evidence that a third

6   party admitted to murder was not a violation of due process where there was doubt about the

7   truthfulness of the confessions and whether they were ever made in the first place and the witnesses

8   were unreliable); *Spivey*, 194 F.3d at 978 (concluding that state trial court did not infringe defendant's

9   constitutional rights by excluding speculative third-party culpability evidence); *cf. Chia v. Cambra*,

10  360 F.3d 997, 1004–08 (9th Cir. 2004) (federal habeas relief granted where several exonerating

11  confessions that bore "strong indicia of reliability" had been excluded from evidence and where those

12  confessions clearly stated that the petitioner had not been involved in the murder at all).  The Court

13  agrees.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

14       First, evidence established that although Lopez was in the same neighborhood on the night of

15  the shooting, he was not witness to it. The confidential informant in Petitioner's case rejected the

16  notion that Lopez was physically present at the shooting in Salinas, a theory upon which Petitioner

17  relies considerably to support his petition.  (Exh. 1; 1 CT at 205 (Q: "Do you remember Ruben ever

18  telling you that he was there with Mario when Mario [shot Raya]? CI: No. ... No he didn't say that ...

19  I think that would be something that I would remember.").)  In fact, the trial court heard testimony

20  during an *in camera* hearing not only from the informant, but also from a police officer and a

21  detective relating to Lopez's proximity to the crime charged, and found it "very clear" that Lopez

22  was not present at the time of the shooting, nor was he a percipient witness to it.  The Court has

23  reviewed the transcript of the *in camera* proceeding and finds the trial court's ultimate findings well-

24  supported.[1]  The confidential informant confirmed that Ruben Lopez was not at the scene of the

25  shooting.  A detective who interviewed the confidential informant in late 2004 confirmed that the

26  informant had related that Lopez had not been present for the shooting and did not bear witness to it.

27  _____

28  [1] The Court specifically requested a chambers copy of the sealed *in camera* hearing transcript on
    August 26, 2014, which Defendants timely provided on September 4, 2014.  (Dkt. Nos. 81, 82.)

1   There was thus no direct physical link between Lopez and the offense for which Petitioner was

2   charged.

3         Furthermore, Petitioner's assertions that Lopez better matched the description of the gunman,

4   was involved in an armed robbery in San Rafael, and possessed a revolver similar to that used in the

5   shooting was not direct evidence or sufficient circumstantial evidence to link Lopez to the crime for

6   which Petitioner was charged and ultimately convicted.  As the trial court noted, the use of a revolver

7   was not unique; revolvers were routinely used in gang-related crimes.  Moreover, the state court

8   reasonably determined that there were significant differences between the crime Lopez committed

9   and the crime for which Petitioner was charged.  Lopez's crime was motivated by robbery, the crime

10  for which Petitioner was charged was not.  (*See* Exh. 4; 1 ART 94-95.)  Lopez's crime was of a

11  distinctly different character than that for which Petitioner was charged.  This is further support for

12  the state appellate court's determination that such evidence could not raise a reasonable doubt as to

13  Petitioner's guilt.

14        For these reasons, evidence concerning crimes committed by Ruben Lopez in Marin County

15  was not material because its disclosure would not have presented a probability sufficient to

16  undermine confidence in the outcome of the trial.  The jury was presented five eyewitnesses who all

17  testified that Petitioner was the shooter.  This was strong evidence against Petitioner—indeed, even

18  despite cross-examinations by defense counsel and the defense's consistent theory of unreliability of

19  eyewitness testimony combined with alleged collusion among the five eyewitnesses, the jury

20  nonetheless found Petitioner guilty.  In contrast, Petitioner concedes that some of the witnesses failed

21  to identify Lopez in a photographic lineup, (Dkt. No. 1 at 18), identifying Petitioner as the shooter

22  instead.  Thus, the Court cannot conclude that the exclusion of the evidence pertaining to Ruben

23  Lopez "undermine[d] confidence in the verdict."  *Strickler*, 527 U.S. at 289-90.  Accordingly, the

24  Court finds that there was no *Brady* violation.

25        The same facts also establish that the state appellate court's determination that the exclusion

26  of third-party culpability evidence did not deprive Petitioner of due process.  To so determine, the

27  Court has balanced the following five factors, almost identical to those cited above: "(1) the probative

28  value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of

1    evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative;

2    and (5) whether it constitutes a major part of the attempted defense." *Chia v. Cambra*, 360 F.3d 997,

3    1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).  The court has also

4    accorded due weight to the state interests underlying the state evidentiary rules on which the

5    exclusion was based.  *See Chia*, 360 F.3d at 1006; *Miller*, 757 F.2d at 995.

6           The first and fourth *Miller* factors are related.  Here, the third-party culpability evidence

7    Petitioner sought to offer was of minimal probative value even though it was also the "sole evidence

8    on the issue."  Petitioner had *no* evidence that placed Lopez at the location of the shooting, either as a

9    percipient witness or as the possible shooter.  Nor does Petitioner argue that the evidence he sought to

10   uncover through discovery, which the trial court denied, would have established that Lopez had been

11   present for the shooting or actually the shooter.  Indeed, the records Petitioner sought from the San

12   Rafael Police Department would have related to a completely different crime; any probative value of

13   such records on the crime for which Petitioner was charged was therefore entirely speculative.  Thus,

14   on balance, the first and fourth *Miller* factors do not support Petitioner's request.

15          On the second *Miller* factor, the evidence upon which Petitioner relies would have not

16   necessarily been reliable.  First, the testimony from the confidential informant relating to Lopez's

17   communications concerning the crime, although reliable enough to justify a police investigation and

18   photo lineup relating to Petitioner's possible commission of the shooting, would not have been

19   independently reliable evidence that Lopez had committed the crime.  As stated above, the

20   confidential informant denied that Lopez was at the scene of the shooting.  Further, although the

21   records of Lopez's commission of another, separate offense would have arguably been reliable, such

22   records would *not* have been reliable as evidence of the crime for which Petitioner was charged.  This

23   factor thus weighs against Petitioner.

24          The third *Miller* factor, whether the evidence is capable of evaluation by the trier of fact, is

25   neutral.  While in general, a jury arguably could have evaluated and weighed such evidence, here

26   there was really none to consider.

27          Finally, the fifth factor, whether it constitutes a major part of the attempted defense, does

28   weigh in favor of admissibility.  However, this on its own cannot overcome the fact of the limited

United States District Court
Northern District of California

United States District Court
Northern District of California

1   probative value the excluded evidence could offer, and the fact that the state had an interest in

2   excluding the third-party culpability evidence where an insufficient proffer and misleading evidence,

3   with only slight probative value, was being offered for presentation to the jury. *See Trujillo* at *10;

4   *Crane,* 476 U.S. at 689-90 ("the Constitution leaves to the judges who must make these decisions

5   'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue

6   risk of 'harassment, prejudice, [or] confusion of the issues' ") (*quoting Delaware v. Van Arsdall,* 475

7   U.S. 673, 679 (1986)).

8        Even assuming arguendo that the trial court's exclusion of evidence relating to Lopez was

9   constitutional error, the error could not have had a "substantial and injurious effect or influence in

10   determining the jury's verdict" under the circumstances of this case. *Brecht v. Abrahamson,* 507 U.S.

11   619, 623 (1993). In light of the significant evidence against Petitioner – five eyewitness accounts –

12   the fact that Lopez was of the same gang as Petitioner, was at the party on Pacific Street the night of

13   the shooting, and was found to have committed a different crime, armed robbery, does not lessen the

14   Court's confidence in the verdict.

15        For all these reasons, Petitioner is not entitled to federal habeas relief on this ground.

16        **B.  Denying Discovery of Identity of Confidential Informant**

17        Petitioner similarly contends that because he was precluded from obtaining discovery as to

18   the identity of a confidential informant, he was unable to present a complete defense. Both the trial

19   court and the state appellate court rejected Petitioner's argument. This Court similarly finds that

20   Petitioner's argument lacks merit.

21        **1.  Legal Standard**

22        In *Roviaro v. United States*, 353 U.S. 53, 59 (1957), the Supreme Court recognized the

23   government's privilege to withhold from disclosure the identity of confidential informants. The

24   scope of that privilege, however, is limited. "Where the disclosure of the informer's identity, or of

25   the contents of his communication, is relevant and helpful to the defense of an accused, or essential to

26   a fair determination of a cause, the privilege must give way." *Id.* at 60-61. The petitioner bears the

27   burden of showing that disclosure would be relevant to at least one defense. *See United States v. Sai*

28   *Keung Wong*, 886 F.2d 252, 256 (9th Cir. 1989) (citing *United States v. Buffington,* 815 F.2d 1292,

34

1   1299) (9th Cir. 1987).  He must show that he has more than a "mere suspicion" that the informant has

2   information which will prove "relevant and helpful" or will be essential to a fair trial.  *United States*

3   *v. Amador-Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993).  Once a defendant makes this threshold

4   showing, a court must balance the "the public interest in protecting the flow of information against

5   the individual's right to prepare his defense" in determining whether to disclose the identity of the

6   confidential informant.  *Roviaro*, 353 U.S. at 62.  There is no bright line rule.  *See id.*  Whether a

7   proper balance renders non-disclosure erroneous depends on the particular circumstances of the case,

8   taking into consideration the crime charged, the possible defenses, the possible significance of the

9   informer's testimony, and other relevant factors.  *Id.*

10   **2.  Discussion**

11   Petitioner contends that the confidential informant's identity was relevant and helpful to the

12   defense and that therefore, the denial of such information resulted in deprivation of his constitutional

13   rights.  To support this point, Petitioner argues that Lopez spoke to the informant and revealed that

14   Lopez was present during the shooting, providing specific information about the incident.  Petitioner

15   claims that "the confidential informant first said petitioner was not responsible for the murder but

16   instead it was Ruben Lopez.  Lopez spoke to the informant and revealed Lopez was present during

17   the shooting, providing specific information about the incident."  (Dkt. No. 1 at 20, citing Exh. 4, 1

18   ART at 38 (June 5, 2011 hearing) and  (Def. Ex. B to Def. Mot in Limine (Nov. 23, 2005 Report; *see*

19   *also* Ex. C, Nov. 23, 2005 Memorandum.))  Petitioner goes on to state that Lopez told the informant

20   that he (Lopez) was a percipient witness to the murder.  Petitioner thus maintains that knowledge of

21   information relative to the shooting was self-incriminating as to Lopez, for there was only one person

22   at the scene of the shooting other than the victim and his friends.  (Dkt. No. 1 at 20; Dkt. No. 62 at

23   22.)

24   After an *in camera* hearing at which the trial court heard testimony from the confidential

25   informant, two officers, and a detective, the trial court expressly found the above facts, memorialized

26   in a memorandum written by the district attorney on November 23, 2005, to be in error.  (Exh. 4, 3

27   ART 506.)  Specifically, the trial court found that "there was some confusion generated by the

28   information contained in the memorandum" and that there had been a "miscommunication" between

United States District Court
Northern District of California

35

the detective and an officer that resulted in the erroneous statement that Lopez saw the shooting. (*Id.*) Accordingly, Petitioner's argument that there had been some prior inconsistent statement on the part of the confidential informant is wrong as a matter of fact; there was never any statement that the confidential informant had been told that Lopez had seen the shooting. (*See* Dkt. No. 1 at 20-21.) Thus, the state appellate court reasonably concluded that there was no evidence that either Lopez or the confidential informant had seen the shooting.

The state appellate court reviewed the trial record, including the sealed transcript of the *in camera* hearing, and determined that the trial court had not abused its discretion or deprived him of his right to prepare a defense in denying Petitioner's request for disclosure of the identity of the confidential informant. The confidential informant could not provide evidence that would place Ruben Lopez at the scene of the shooting, for the confidential informant maintained that Lopez never told him that he (Lopez) had seen the shooting. (Exh. 1, 1 CT at 205 (Q: "Do you remember Ruben ever telling you that he was there with Mario when Mario [shot Raya]? CI: No. ... No he didn't say that ... I think that would be something that I would remember."))

Given that Petitioner's claim that the confidential informant had information from a percipient witness (Lopez) was found to be false, Petitioner's claim that the identity of the confidential informant was necessary to prepare his defense becomes tenuous at best. Petitioner argues that the fact that Lopez conveyed information to the informant "when no one else possessed" such evidence was incriminating to Lopez, but cites no record evidence to support the assertion that *only* Lopez had learned of the shooting the night it happened (Dkt. No. 1 at 20.), and after a review of the record, the Court finds no evidence to support such a claim. The fact that a person was shot on the street with five eyewitnesses present, and that there was a party on the same street counsels against any inference that Lopez was the sole possessor of the information at the time he relayed the same to the confidential informant. Nor has Petitioner advanced sufficient argument to show that he has more than a "mere suspicion" that the informant has information which will prove "relevant and helpful" to a defense or will be essential to a fair trial. *United States v. Amador-Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993). The confidential informant had not witnessed the shooting, nor had his source witnessed the shooting.

1    Thus, the confidential informant was not able to provide evidence probative on Petitioner's

2    defense theory that he had *not* been the shooter.  Finally, whatever possible evidence may have been

3    uncovered relative to the confidential informant had his identity been disclosed paled in comparison

4    to the interest of the public in the "free flow of information" and effective law enforcement.  The

5    confidential informant's willingness to cooperate with law enforcement set in motion the entire

6    investigation into Petitioner's involvement in the crime and resulted in a photo lineup including his

7    visage, from which the eyewitnesses were able to identify Petitioner as the shooter.  Given that the

8    confidential informant did not bear witness to the crime and was never told by Lopez that he (Lopez)

9    had either been present for the shooting or had committed the shooting, the likely value of any

10   evidence obtained as a result of disclosing the informant's identity relative to Petitioner's defense is

11   entirely speculative.  The cost to the public of such disclosure, however, is all but certain – and

12   without doubt, substantial.

13   Accordingly, the Court finds that the denial of Petitioner's request to disclose the identity of

14   the confidential informant was not contrary to or an unreasonable application of controlling Supreme

15   Court authority.  Petitioner's requested relief on this ground is **DENIED**.

16   **V.    CUMULATIVE PREJUDICE**

17   Cumulative error is more likely to be found prejudicial when the government's case is weak.

18   S*ee, e.g., Thomas v. Hubbard*, 273 F.3d.1164, 1180 (noting that the only substantial evidence

19   implicating the defendant was the uncorroborated testimony of a person who had both a motive and

20   an opportunity to commit the crime); *Walker v. Engle*, 703 F.2d 959, 961-62, 968 (6th Cir. 1983),

21   *cert. denied*, 464 U.S. 951 (1983).  However, where there is no single constitutional error existing,

22   nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500,

23   524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d

24   699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Similarly, there can be

25   no cumulative error when there has not been more than one error.  *United States v. Solorio*, 669 F.3d

26   943, 956 (9th Cir. 2012).

27   Here, the Court has considered and rejected all of Petitioner's claims on their merits, and none

28   of the alleged errors or omissions, evaluated singularly or together, constitute a constitutional error.

Thus, Petitioner's cumulative error claim must fail. *See Mancuso,* 292 F.3d at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").

### CONCLUSION

For the reasons stated above, the Court finds Petitioner is not entitled to federal habeas relief. Accordingly, his petition is **DENIED** and a certificate of appealability will not issue.

The Clerk shall enter judgment in favor of Respondent and close the file.


**IT IS SO ORDERED.**

Date: September 29, 2014

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

38